# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------X

CORPORATE FLIGHT MANAGEMENT,
INC. and AIR CARRIER MANAGEMENT
COMPANY, LLC,

                    Plaintiffs,           Case No: _____

      -against-

                                   **SUMMONS**

FLYGLO LLC.

                    Defendant.

----------------------------------------------------X

**TO THE ABOVE NAMED DEFENDANT**:

       PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED to answer the complaint of the plaintiffs herein and to serve a copy of your answer on the counsel for plaintiffs, at the address indicated below, within twenty (20) days after service of this Summons, exclusive of the day of service, or within thirty (30) days after service is complete if this Summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you on default for the relief demanded in the complaint.

       Plaintiff designates New York County as the place of trial. Venue is proper pursuant to Gen. Obligations Law §5-1402 and insofar as the causes of action arise under a series of agreements that include a consent by the parties to the jurisdiction and venue of the courts situated within the State of New York, New York County.

Date:  New York, New York
   December 1, 2016

           Kimberly Kalmanson
           Kalmanson Law Office, PLLC
           One Grand Central Place
           60 East 42nd Street, Suite 1101
           New York, New York 10165
           TEL (718) 974-4500
           FAX (212) 808-0719
           kim@kalmansonlawoffice.com

           *Attorneys for Plaintiffs Corporate Flight*
           *Management, Inc. and Air Carrier*
           *Management Company, LLC*

TO:  FlyGlo, LLC
    1450 Poydras Street, #210
    New Orleans, LA 70112

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------X

CORPORATE FLIGHT MANAGEMENT,
INC. and AIR CARRIER MANAGEMENT
COMPANY, LLC,

       Plaintiffs,    Case No: _____

    -against-

              **COMPLAINT**

FLYGLO LLC.

       Defendant.
-------------------------------------------------------X

   Plaintiffs, Corporate Flight Management, Inc. and Air Carrier Management Company, LLC, by and through their undersigned counsel, Kalmanson Law Office, PLLC, allege the following upon personal knowledge as to their own acts, and upon information and belief as to all other matters:

## PARTIES

   1.  Corporate Flight Management, Inc. ("CFM") is a corporation organized under the laws of the State of Tennessee. CFM is in the business of providing various aviation and aircraft related services. CFM's principal place of business is 276 Doug Warpoole Road, Smyrna, Rutherford County, Tennessee, 37167.

   2.  Air Carrier Management Company ("ACMC") is a limited liability company duly organized pursuant to the laws of the State of Tennessee. ACMC's principal place of business is located at 276 Doug Warpoole Road, Smyrna, Rutherford County, Tennessee, 37167.

   3.  Defendant FlyGlo, LLC ("GLO") is a Delaware limited liability company with its principal place of business at 1450 Poydras Street, #210, New Orleans, LA, 70112. GLO

provides passenger air transportation services through CFM to various cities including Memphis, Tennessee.

## JURISDICTION AND VENUE

4.      Jurisdiction is proper pursuant to C.P.L.R. §§ 301 and 302 because the causes of action arise under a series of agreements in which Defendants consented to the jurisdiction of the courts of the State of New York, New York County and have waived any objections thereto.

5.       Venue is based upon Gen. Obligations Law §5-1402 insofar as the causes of action arise under a series of agreements that include a consent by the parties to the jurisdiction and venue of the courts situated within the State of New York, New York County, and the contract value exceeds $1 million.

## FACTS

### I. Summary

6.      This is an action to recover damages for GLO's breaches of a series of inter-related and cross-defaulting contracts entered into with the Plaintiffs.

7.      On or prior to August 28, 2015, GLO leased 3 aircraft from Wells Fargo Bank Northwest, N.A., ("Wells Fargo") as the Owner and Trustee, under a trust established for the benefit of the beneficial owner of such aircraft, Alandia Air Ab, a Finnish company ("Alandia"). The aircraft were manufactured by SAAB Scania, and bore the following serial numbers and registration numbers: 340B-224, registered in the United States as N9CJ ("Aircraft 224"), 340-B-346, registered in the United States as N346CJ ("Aircraft 346") and 340-B-220, registered in the United States as N220MJ ("Aircraft 220", and together with Aircraft 224 and Aircraft 346, are collectively referred to herein as the "Aircraft")

8.     Between September and December of 2015, GLO, in turn, subleased the Aircraft to CFM.

9.     Pursuant to a series of inter-related contracts, CFM agreed to maintain and operate the Aircraft for GLO in exchange for monthly management fees and reimbursement of certain costs from GLO.

10.     GLO engaged ACMC to manage certain administrative tasks associated with GLO and CFM's operations related to the Aircraft.

11.     Specifically, ACMC agreed to collect, record and pay invoices related to the operations and maintenance of the Aircraft on behalf of, and subject to the approval of GLO.

12.     Under the Agreements, GLO was to provide the funds for ACMC to pay all invoices, and ACMC would use those funds to pay invoices.

13.     GLO agreed to maintain an account with ACMC, the minimum balance for which was ***never*** permitted to fall below $500,000.

14.     ACMC was to pay invoices out of the funds in this account.

15.     In exchange for ACMC's services, GLO agreed to pay ACMC a monthly fee.

16.     In just the first year of the relationship, ACMC has paid more than $5,300,000.00 on behalf of GLO—amounts that GLO agreed to reimburse.

17.     In addition, under the relevant agreements, GLO was to owe ACMC and CFM no less than $2,268,500.00 in monthly management fees during the initial terms of those agreements.

18.     In direct breach of the agreements between the parties, GLO has failed and refused to:

Page 3 of 20

a.      Maintain the minimum required balance in the Payment Agent Account (as defined below);

b.      Pay CFM and ACMC their fees, required under the relevant agreements; and

c.      Reimburse CFM and ACMC for certain invoices that CFM and ACMC have paid on behalf of GLO.

## II.      The Relevant Agreements

19.      On or before August 28, 2015, GLO and Wells Fargo, as owner-trustee on behalf of a trust established for the economic benefit of Alandia, entered into a Master Lease by which Wells Fargo leased the Aircraft to GLO.

## A.  The Charter Agreement

20.      On September 9, 2015, CFM and GLO enter into an Aircraft Management Services and Charter Agreement (the "Charter Agreement").  The Charter Agreement provides that CFM "will charter the Aircraft to GLO to provide transportation services as a Direct Air Carrier for Public Charters arranged and sponsored by GLO . . . subject to appropriate authorization from DOT or FAA, as applicable." §1(d).

21.      The Charter Agreement includes a choice of law provision, by which the parties agreed that the Charter Agreement is to be governed by New York law:

> "This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York without giving effect to any choice or conflict of law, provision, or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York."

22.      In Sections 2 and 3, the Charter Agreement sets forth the flight operations and direct air carrier services that CFM was to perform.

23.     In consideration for CFM's services, GLO agreed pay CFM certain management

fees:

> "GLO shall pay to CFM monthly management fees consisting of the following amounts as set forth in Appendix A: the applicable Base Fee, based on the total number of Aircraft on CFM's operations specifications during the month, plus the per Aircraft Fee multiplied by the number of Aircraft on CFM's operations specifications during the month, plus the per Aircraft Fee multiplied by the number of Aircraft undergoing Initial Inspections under Section 2.b of the Subleases or Conformity under Section 2.c of the Subleases during the month."

Charter Agreement, §6(d)

24.     As of the date of this filing, GLO is required to pay CFM a total of $48,500.00 per

month as management fees.

25.     The Charter Agreement provides that GLO is required to cover all costs and

expenses of operating the Aircraft.

26.     The Charter Agreement also requires that GLO reimburse CFM for all Direct

Operating Costs, including, but not limited to, maintenance of the Aircraft:

> "The Direct Operating Costs reimbursable to CFM as part of the Charter Price[1] include, but are not limited to the following:  . . . .  **[a]ll maintenance and cleaning expenses required for the aircraft operation**, including, but not limited to, **engine programs**, parts programs, line maintenance, **heavy maintenance**, reserve payments in compliance with the Subleases, and all cleaning expenses."

*Id.*, §6(f)(v) (emphasis supplied).

27.     The Charter Agreement sets forth that GLO's failure to make payments due to

CFM or ACMC constitutes an event of default thereunder. The Charter Agreement also provides

that (subject to the federal regulations) CFM may terminate the Charter Agreement *immediately*

---

[1] The Charter Agreement defines "Charter Price" as the "Direct Operating Costs as set forth in paragraph 6.f below . . . ."  Charter Agreement, §6(e).

Page 5 of 20

upon an event of default, including GLO's failure to tender any payment due to CFM or the Payment Agreement:

> "CFM's obligation to perform under this Agreement may be suspended immediately or **this Agreement may be immediately terminated by CFM upon an event of default by GLO, which shall include the following: . . . (iii) GLO's failure to make any payment to CFM or to [ACMC] when due** . . . ."

*Id.*, §7(c) (emphasis supplied).

28.     However, the Charter Agreement does not release GLO from its obligations to tender payments due and owing to CFM under the Charter Agreement, even in the event of a termination: "In the event of any such suspension or termination of this Agreement, GLO shall nonetheless be responsible for and required to pay all amounts then due and owing to CFM under the terms of th[e Charter Agreement]." *Id.*, §7(f).

29.     Further, GLO's obligation to tender payments under Section 7(f) of the Charter Agreement "survive[s] the expiration or termination" of the Charter Agreement. *Id*.

30.     The parties further agreed that a default of the Charter Agreement is to "constitute a default under each Sublease and the Payment Agent Agreement." *Id.*, §7(g).

## B.  The Subleases and Consents

31.     Concurrently on September 9, 2015, and then again on October 15, 2015, and December 1, 2015, CFM and GLO executed three Aircraft Sublease and Maintenance Agreements ("Sublease(s)") regarding Aircraft 220, Aircraft 224, and Aircraft 346, respectively.

32.     The Subleases are all substantially similar.

33.     By each Sublease, GLO

> "exclusively sublease[d] and transferr[ed] possession of the [associated] Aircraft to CFM during the term of th[e Sublease] Agreement with the exclusive right to manage, operate, and maintain the Aircraft as required by law or applicable regulation and as permitted under th[e Sublease] Agreement."

Subleases, at §2(a).

34.     The Subleases append Sublease Consent Agreements (the "Consent(s)"), executed by and between Wells Fargo, Alandia, GLO and CFM, setting forth the terms by which Wells Fargo and Alandia consented to the Subleases.  Subleases, Appendices C.

35.     The Consents are expressly incorporated by reference into, and form a part of, the Subleases: "This Agreement is an integral part of the Sublease and is incorporated therein by reference as if set forth in its full text."  Subleases, Appendices C, §14.

36.     CFM and GLO agreed that the Subleases would be governed by New York law:

> "This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York without giving effect to any choice or conflict of law, provision, or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any other jurisdiction other than the State of New York."

Subleases, §9(g).

37.     Under the Consents to the Subleases, CFM and GLO also consented to the jurisdiction of the court situated in New York State, New York County:

> "This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York without giving effect to any choice or conflict of law, provision or rule . . . that would cause the application of the laws of any jurisdiction other than the State of New York.  **Each of the parties hereto hereby expressly submits to the non-exclusive jurisdiction of the state and federal courts located in the city, county, and state of New York, USA (i.e. Manhattan)** . . . ."

Subleases, Appendices C, at §17 (emphasis added).

38.     In the Consents to the Subleases, CFM and GLO waived all objections to venue in New York County:

> "Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement brought in the state or federal courts in the city, county, and state

Page 7 of 20

of New York, and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in such courts has been brought in an inconvenient forum."

*Id*.

39.     The Subleases unequivocally provide that while CFM is to handle all operations, maintenance and repairs of the Aircraft, <u>GLO is solely responsible for all costs and expenses associated with such operation, maintenance and repairs of the Aircraft.</u>  Subleases, §2(d).   The Subleases state:

> **"The Aircraft shall be maintained by CFM, at the sole cost and expense of GLO** (i) in a state of continuous airworthiness under its standard airworthiness certificate, (ii) in accordance with the requirements of the manufacturer's recommended maintenance and inspection programs and specifications, and (iii) as required by (A) any maintenance service plan or program applicable to the Aircraft, (B) any airworthiness directives or mandatory service bulletins applicable to the Aircraft, (C) all applicable requirements of 14 CFR Part 135, (D) CFM air carrier operations specifications, and (E) CFM policy and operating procedures**.  CFM has operational control of the Aircraft at all times during the Term of this Agreement and is authorized to take such actions as necessary to ensure that the Aircraft is maintained as provided in this Agreement**, except as expressly provided elsewhere in this Agreement."

*Id*., §2(d) (emphasis supplied).

40.     The Subleases further provide, in Section 2(h), that "CFM reserves the right to require GLO to directly engage and pay any third party maintenance provider for any maintenance event that is expected to result in over $10,000 in costs and expenses."

41.     The Subleases set forth that GLO's failure to pay invoices when due constitutes an event of default.  The parties agreed that CFM has the right, under the Subleases, to suspend its obligations under the Subleases, and immediately terminate the Subleases (subject to applicable regulation) upon such an event of default:

> "CFM's obligation to perform under this Agreement may be suspended immediately, or the Agreement may be immediately terminated by CFM, subject to the requirements of 14 CFR Part 380, upon an event of default by GLO, which

Page 8 of 20

> shall include the following: . . . (iii) **GLO's failure to pay any invoice when due** [or] (iv) breach or default of any other condition of this Agreement, the Charter Agreement, or the Payment Agent Agreement by GLO and the failure of GLO to cure or remedy such breach or default within ten (10) days after receiving notice from CFM."

*Id.*, §6(b) (emphasis supplied).

## C. The Payment Agent Agreement

42.     ACMC and GLO are parties to a Payment Agent Agreement (the "Payment Agent Agreement") dated September 9, 2015.

43.     The Payment Agent Agreement, too, provides that it is to be governed by New York law: "This Agreement shall be construed, performed and enforced in accordance with the laws of the State of New York applicable to contracts made and to be performed in such State." Payment Agent Agreement, §6.02.

44.     By the Payment Agent Agreement, GLO "appoint[ed ACMC], to serve as payment agent in connection with disbursements of funds from the Account (as defined below)." *Id.*, §1.01.

45.     By the Payment Agent Agreement, ACMC "accept[ed] such appointment pursuant to the terms and conditions set forth" in the Payment Agent Agreement.  *Id.*

46.     Essentially, ACMC was to collect, track and pay vendor invoices on behalf of GLO, in accordance with the terms and conditions of the Payment Agent Agreement.

47.     To effectuate this purpose, ACMC was required to (and did) set up an account for GLO (the "Payment Agent Account"), from which ACMC could pay vendor invoices.  Section 1.02 of the Payment Agent Agreement states:

> "The Payment Agent shall establish a business checking account in the name of GLO. . . to receive, hold and distribute the amounts contained therein to be

disbursed pursuant to the provisions of th[e Payment Agent] Agreement (the "Account")."

48.     GLO unambiguously and unequivocally agreed that it would, ***at all times***, maintain a minimum balance in the Payment Agent Account of $500,000.  Section 1.04 of the Payment Agent Agreement provides: **"GLO shall keep Five Hundred Thousand and 00/100 Dollars ($500,000 USD) in immediately disbursable funds in the Account at all times."** (emphasis added).

49.     In fact, the Payment Agent expressly accepted its duties under the Payment Agent Agreement ***only subject to certain terms and conditions***, including **"GLO's ongoing replenishment of immediately disbursable funds in the Account such that the Minimum Balance is achieved net of the Retained Portion.**"[2]  *Id.*, §3.01(m) (emphasis added).

50.     In consideration for performing its duties as the Payment Agent, ACMC was to receive a monthly fee of $16,000,[3] plus reimbursement for all costs and expenses.  *Id.*, §5.01.

51.     The Payment Agent Agreement cross-defaults with the Charter Agreement and the Subleases:

> "any default under either the Charter Agreement or any of the Subleases shall be a default under this Agreement.  Furthermore, the parties intend that any default under this Agreement shall be a default under the Charter Agreement and the Subleases."

*Id.*, §2.03(b)(i).

### III. GLO Breached the Relevant Agreements

---

[2] The "Retained Portion" is a "portion of the funds in the Account" that the Payment Agent is, in its "reasonable discretion" "authorized to retain" in the event of certain "conflict[s], disagreement[s] or dispute[s] . . . between GLO and any of its vendors . . . ." until some resolution to the action is reached.  Payment Agent Agreement., §3.01(l).

[3] ACMC was to receive $10,000 for the first month of the Payment Agent Agreement, and $16,000 a month for every month thereafter.  *Id.*, Exhibit B thereto.

52.     CFM and ACMC have satisfied all of their obligations under the Subleases and Consents, the Charter Agreement and the Payment Agent Agreement.

53.     Nevertheless, GLO has materially breached all of the relevant contracts, resulting in significant damage to CFM and ACMC.

### A.  GLO Has Failed to Pay Monthly Management Fees to ACMC and CFM

54.     As set forth more fully above, pursuant to Sections 6(d) of the Charter Agreement and Section 5.01 of the Payment Agent Agreement, GLO agreed to pay CFM and ACMC, respectively, monthly management fees.

55.     CFM and ACMC performed all of their obligations under the Charter Agreement, Subleases and Consents and the Payment Agent Agreement.

56.     On or about November 16, 2016, GLO was required to pay ACMC its monthly management fees, in accordance with Section 5.01 of the Payment Agent Agreement.

57.     As of the date of this filing, GLO has failed and refused to tender payment to ACMC in the amount of $16,000 as monthly management fees, in material breach of, and default under the Payment Agent Agreement.

58.     As of the date of this filing, GLO has failed and refused to tender payment to CFM in the amount of $48,500 as monthly management fees, in material breach of, and default under the Charter Agreement.

59.     The management fees continue to accrue to ACMC under the Payment Agent Agreement and to CFM under the Charter Agreement.

60.     Failure to pay ACMC also constitutes an event of default under Section 7(c)(iii) of the Charter Agreement, .

61.     Because GLO is in default under the Payment Agent Agreement and the Charter Agreement, and pursuant to Section 7(g) of the Charter Agreement and Section 2.03(b)(i) of the Payment Agent Agreement, GLO is also in default under the Subleases and Consents.

### B.  GLO Has Failed to Maintain the Required Minimum Balance in the Payment Agent Account

62.     As set forth more fully above, pursuant to Section 1.04 of the Payment Agent Agreement, GLO was required to maintain a minimum balance of five hundred thousand dollars ($500,000) in the Payment Agent Account, **at all times**.

63.     Since on or about June 28, 2016, GLO has failed to maintain the minimum balance of five hundred thousand dollars in the Payment Agent Account.

64.     In fact, as of the date of this filing, the balance in the Payment Agent Account is under $4,200.00.

65.     Moreover, since October 1, 2016, the balance in the Payment Agent Account has not risen above $287,560.25.

66.     Despite having no obligation to do so, CFM gave GLO timely notice of default for failure to maintain the required minimum balance in the Payment Agent Account on May 27, 2016, August 26, 2016, September 22, 2016 and finally again on October 25, 2016.  GLO has failed to timely cure the default under the Payment Agent Agreement.

67.     As a result of this conduct, GLO has materially breached the Payment Agent Agreement, and is in default under the Payment Agent Agreement.

68.     As a result, and pursuant to Section 2.03(b)(I) of the Payment Agent Agreement, GLO is also in material breach and default under the Charter Agreement and the Subleases and Consents.

### C.  GLO Has Failed to Reimburse CFM for Costs and Expenses
### of Operations and Maintenance of the Aircraft

69.    In accordance with, *inter alia*, Sections 6(c) and 6(f)(v) of the Charter Agreement, and Sections 2(d) and 2(h) of the Subleases, GLO was required to reimburse CFM for all costs and expenses in connection with invoices from third party vendors for, among other things, the operation and maintenance of the Aircraft.

70.    In accordance with, *inter alia*, Section 2(a) of the Subleases, CFM was permitted to have GLO "directly engage and pay any third party maintenance provider for any maintenance event that is expected to result in over $10,000 in costs and expenses."

71.    Between April 22, 2016 and the present, CFM paid various invoices on behalf of GLO in connection with the maintenance of the Aircraft, and has submitted various invoices to GLO for the reimbursement of these costs and expenses.

72.    As of the date of this filing, GLO has failed and refused to reimburse CFM for some of the amounts CFM paid to cover these outstanding invoices.

73.    A portion of the unreimbursed amounts, $12,185.87, were incurred after an inspection of an engine on Aircraft 220.

74.    The inspection was the result of an aborted battery start of the engine on Aircraft 220, and GLO has refused to reimburse the amounts, falsely stating that CFM was negligent in performing the battery start.

75.    GLO has also demanded that CFM reimburse it for approximately $80,000 in direct costs arising from the same inspection.

76.    CFM has asserted that it has no obligation to reimburse GLO for the costs of maintenance incurred after the aborted start of the engine on Aircraft 220.

77. CFM has asserted that GLO is required to reimburse CFM for the costs of maintenance incurred after the aborted start of the engine on Aircraft 220.

78. Under the Charter Agreement and Subleases, GLO is responsible for costs and expenses of maintenance and repairs _regardless_ of whether CFM was purportedly negligent in the handling of the Aircraft.

79. As a result, GLO is in material breach of the Section 2(d) of the Sublease for Aircraft 220, and Section 6(f)(v) of the Charter Agreement.

80. Moreover, CFM was not negligent in the battery start of the engine.

81. On March 29, 2016, the operations crew for Aircraft 220 attempted a battery start.

82. Battery starts are permitted under the relevant regulations and CFM's FAA-approved manuals.

83. Upon starting the engine, the crew noticed that the Aircraft's instrumentation indicated an Inner Turbine Temperature (the temperature inside the combustion chamber of the engine) that exceeded the limits set by the manufacturer for the engine.  As a result, the captain aborted the start procedure by pulling the condition lever to FUEL OFF in accordance with CFM's FAA-approved manuals.

84. After the aborted start event on March 29, 2016, the right engine was removed from Aircraft 220 and inspected by H&S Aviation, Ltd. in Portsmouth, Hants, England for evidence of internal damage caused by excessive heat.  The inspection examination confirmed that the engine had not exceeded its internal temperature limit and no internal heat damage was found.  The Aircraft's instrumentation had appeared to indicate higher temperatures, but the engine itself, had never faced a temperature in excess of the manufacturer's limits.

Page 14 of 20

85.     Nevertheless, the unsuccessful start resulted in fees for the inspection from H&S Aviation, Ltd.

86.     In addition, at the time of the inspection, H&S Aviation, Ltd. corrected certain other, unrelated maintenance discrepancies within the engine.

87.     Thus, no damage occurred to the engine as a result of the reported high temperature during the aborted battery start on March 29, 2016.  ***CFM was not negligent in the battery start of the engine***.

88.     For this reason, too, under Section 2(d) of the Sublease for Aircraft 220, and Section 6(f)(v) of the Charter Agreement, GLO is required to pay for all costs and expenses related to the aborted engine start event.

89.     As a result of its failure to reimburse CFM for no less than $53,469.14 in invoices that CFM paid on behalf of GLO, GLO is in material breach of the Section 2(d) of the Subleases, and Section 6(f)(v) of the Charter Agreement.

90.     As a result, GLO is in default under the Sublease and Consents and the Charter Agreement.  As a result, and by virtue of Section 7(g) of the Charter Agreement, and Section 6(e) of the Sublease, GLO is also in default of the Payment Agent Agreement.

91.     As a result, the Plaintiffs have been damaged in an amount no less than $53,469.14.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Breach of the Contract Under the Charter Agreement**
**(Against GLO)**

92.  Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as though fully set forth herein.

93.   CFM and GLO knowingly and voluntarily entered into the Charter Agreement, a valid, existing, executed and binding agreement, by which, *inter alia*, CFM agreed to perform certain services for GLO in exchange for a monthly management fee.

94.   CFM performed all of its obligations under the Charter Agreement.

95.   GLO has breached the Charter Agreement, by, *inter alia*:

      a.   failing to pay ACMC management fees;

      b.   failing to pay CFM management fees

      c.   failing to reimburse CFM for costs and expenses incurred in connection with performing its obligations under the Charter Agreement; and

      d.   defaulting under the Payment Agent Agreement and Subleases (as set forth more fully above and in the Second and Third Causes of Action).

96.   CFM has been damaged as a result of these breaches.

97.   As a result of GLO's breaches, CFM is entitled to compensatory and consequential damages, in an amount to be determined at trial, but in no event less than $94,400.63 suffered as a result of GLO's breaches.

### AS AND FOR A SECOND CAUSE OF ACTION
### Breach of Contract Under the Subleases and Consents
### (Against GLO)

98.   Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as though fully set forth herein.

99.   CFM and GLO knowingly and voluntarily entered into the Subleases and Consents, valid, existing, executed and binding agreements, by which, *inter alia*, GLO subleased and transferred possession of the Aircraft with the exclusive right to manage the Aircraft, and CFM agreed to maintain the Aircraft at GLO's **sole cost and expense**.

Page 16 of 20

100. CFM performed all of its obligations under each of the Subleases and Consents.

101. GLO has breached each of the Subleases and Consents, by, *inter alia*:

   a.  failing to reimburse CFM for costs and expenses related to the Aircraft; and

   b.  defaulting under the Payment Agent Agreement and the Charter Agreements

(as set forth more fully and above and in the First and Third Causes of Action).

102. CFM has been damaged as a result of these breaches.

103. As a result of GLO's breaches, CFM is entitled to compensatory and consequential

damages, in an amount to be determined at trial, but in no event less than $53,469.14 suffered as

a result of GLO's breaches.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Breach of Contract Under the Payment Agent Agreement**
**(Against GLO)**

104. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as

though fully set forth herein.

105. ACMC and GLO knowingly and voluntarily entered into the Payment Agent

Agreement, a valid, existing, executed and binding agreement, by which, *inter alia*, ACMC

agreed to establish a Payment Agent Account for the benefit of GLO, and to track and pay

invoices related to the Aircraft, and GLO agreed to (1) maintain a minimum balance of $500,000

in the Payment Agent Account at all times; and (2) pay ACMC a monthly management fee.

106. ACMC performed all of its obligations under the Payment Agent Agreement.

107. GLO has breached the Payment Agent Agreement, by, *inter alia*:

   a.  failing to maintain a monthly minimum balance of $500,000 in the Payment
       Agent Account;

   b.  failing to pay ACMC management fees; and

Page 17 of 20

    c.   defaulting under the Subleases and Consents and the Charter Agreements (as set forth more fully above and in the First and Second Causes of Action).

108. ACMC has been damaged as a result of these breaches.

109. As a result of GLO's breaches, ACMC is entitled to compensatory and consequential damages, in an amount to be determined at trial, but in no event less than $16,000.00 suffered as a result of GLO's breaches.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Declaratory Judgment**
**(Against GLO)**

110. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as though fully set forth herein.

111.    Under Sections 2(d) of the Subleases and Consents and Section 6(f)(v) of the Charter Agreement, GLO is required to pay for _all_ costs and expenses related to repairs and maintenance of the associated Aircraft.

112.    GLO has failed to pay certain costs and expenses related to the aborted engine start on March 29, 2016, upon information and belief, because it asserts that CFM was purportedly negligent in its actions.

113.    GLO has asserted that CFM is required to reimburse GLO for the costs and expenses that it paid after the aborted engine start on March 29, 2016.

114.    According to the terms of the Subleases and Consents and Charter Agreement (and notwithstanding that CFM was _not_ negligent in its actions) GLO, alone, is responsible for the payment of the costs and expenses regardless of whether CFM is negligent in performing its maintenance duties.

Page 18 of 20

115.    GLO's assertion that it is not responsible for the costs and expenses related to the aborted engine start creates a justiciable controversy.

116.    As a result of GLO's actions, CFM is entitled to a declaratory judgment that (1) irrespective of any purported negligence on the part of CFM, GLO is responsible for the payment of all costs and expenses related to the aborted engine start on March 29, 2016, and therefore (2) GLO is in default under the Subleases and Consents and Charter Agreement for failure to reimburse CFM for these costs and expenses.

117.    ACMC and CFM request that the Court declare that GLO is (1) required to pay the parts replacement costs, inspection costs, and any other costs or expenses arising out of, or related to the aborted engine start on March 29, 2016 under the terms of the Sublease and Consent for Aircraft 220 and the Charter Agreement, and (2) in default under the Subleases and Consents and Charter Agreement.

WHEREFORE, Plaintiffs pray for the following relief:

a.    On each cause of action, compensatory and consequential damages in an amount to be determined at trial;

b.    A declaration that GLO is (1) required to pay all costs and expenses related to the aborted start incident on March 29, 2016 as maintenance costs under the terms of the Sublease and Consent for Aircraft 220 and the Charter Agreement, and (2) in default under those Agreements for failure to reimburse CFM for these costs and expenses;

c.    Attorney's fees and costs in connection with the prosecution of this action; and

Page 19 of 20

d.      Such other and further relief as this Court deems just and proper.

Dated: New York, New York
            December 1, 2016

Respectfully submitted,

Kimberly Kalmanson
Kalmanson Law Office, PLLC
One Grand Central Place
60 East 42nd Street, Suite 1101
New York, New York 10165
TEL (718) 974-4500
FAX (212) 808-0719
kim@kalmansonlawoffice.com

*Attorneys for Plaintiffs Corporate Flight
Management, Inc. and Air Carrier
Management Company, LLC*

Page 20 of 20